Our next case is Orellana v. United States. Good morning. Good morning. Is it Mr. Maida? That's correct. Maida, thank you. Hold on just one second. Can you reset the clock? Thanks. May it please the Court, my name is Brian Maida. I represent the petitioner in this case, Brian Guzman Orellana. I respectfully request three minutes for rebuttal. Sure. Among other relief, Mr. Guzman seeks asylum and withholding of removal because he was persecuted based on his membership in a particular social group of complaining witnesses against Major Salvadoran gangs. Now, typically to prove the cognizability of a particular social group, you have to show three things, that the group shares common immutable characteristics, that the group is defined with sufficient particularity, and that the group is socially distinct. Can you reconcile your position with our recent opinion in Radio Walla? Your Honor, so I think it's important, before we get to Radio Walla, I think we should start with Garcia. Okay. So the government's argument essentially comes down to that because Mr. Guzman did not testify in court, his group cannot be legally cognizable. Now, in Garcia, this court held that assisting law enforcement against violent gangs in Guatemala was a legally cognizable particular social group. Now, there the petitioner did testify in court, albeit it was in disguise and outside the presence of the defendants. But importantly, the court in Garcia made no mention of any requirement that a petitioner testify in court. And, in fact, when the Garcia court was distinguishing a prior BIA ruling in ReCA, which dealt with a confidential informant, the Garcia court distinguished that case not because the confidential informant didn't testify in court, but rather because, quote, that confidential informant's, quote, aid to law enforcement was not public. So the Third Circuit, since Garcia, was focused on the public versus non-public cooperation. That was the distinction. And then so when we get to Radio Walla in July, the court actually reaffirmed the holding in Garcia and clarified the relevant standard. Now, the government cites the Radio Walla case on two separate occasions for the proposition that only witnesses who testify in court can form a cognizable group, and that's just not the holding in Radio Walla. Radio Walla merely held that a confidential informant who cooperates privately cannot form a legally cognizable social group. And that's consistent with cases from other circuits. That's consistent with BIA cases. Now, had the Radio Walla court wanted to hold that there was a requirement that you testify in court, it would have needed to distinguish away that language in Garcia focusing on the public versus non-public distinction. But instead of distinguishing that case, the Radio Walla court actually relies on it and goes to great lengths to explain why the Garcia particular social group satisfied the social distinction. And when it explains why Garcia satisfies social distinction, the Radio Walla court says the cooperation in Garcia was such that, quote, all are readily aware of it. And again, the Radio Walla court was saying because the cooperation in Garcia was public, it was socially distinct. And so then the Radio Walla court actually distinguishes the petitioner in Radio Walla who was confidential, who cooperated privately, and whose status was never assuredly disclosed to the public, and therefore is indistinguishable from society, with the petitioner in Garcia, who cooperated publicly and whose status was assuredly disclosed to society. And again, the Radio Walla court actually made clear that testifying publicly is not the only way to assuredly disclose, but rather a means like testifying publicly would be sufficient. And now Mr. Guzman was seen talking to uniformed police officers on the street in front of his house in public for all to see. In fact, the suspect of the murders walked by and saw Mr. Guzman talking to the police. And the crime scene was right next door. The crime scene was right next door. And in fact, right after that conversation, the police hopped the fence and dug up the dead bodies. And so anyone who was watching would have clearly seen Mr. Guzman talking to the police, very public, and would have seen the cops immediately go and find the bodies. All right. The BIA did not agree with your petitioner's position, but what mistake did the BIA make? So, Your Honor, the BIA made several mistakes. First, the BIA really relied, the same way the government did, on this important idea that Mr. Guzman did not testify. But again, that's not consistent with the holdings of this circuit. But another important mistake the BIA made, and the IJ made as well, is they were focused on really the membership aspect in a particular social group and not the cognizability of the group itself. And it's important to highlight that distinction. This circuit has made clear that, and it recently enumerated the elements of an asylum claim in SERL. And this court made clear that the cognizability of a particular social group and membership in that group are two separate and distinct inquiries. And the BIA, like the IJ, was focused on this idea that because Mr. Guzman testified that he did not actually give the police information, that he could not be a member of this group. And the petitioner's position is that that would actually go to his membership in the group. And his position from the beginning has never been that he cooperated with the police, but rather that he was an imputed member of the group. And this court really highlighted that distinction in the Amfani case, where the particular social group in question was homosexuals. And the petitioner, who testified that he was not a member of that group, rather said that he was persecuted based on his imputed membership in that group. And this court said they agreed that was a legally cognizable group and that the petitioner there was an imputed member of that group. So it shows a distinction between actually being a member of that group and having a legally cognizable group. Aren't you opening up a class that really is infinite, that anyone seen talking to a policeman can say, oh, well, I'm not considered to be a police informant, whereas the policeman was simply telling him that his car was illegally parked. But he can take advantage of that imputed status to say, I'm a member of this class. Where do we stop? I mean, Your Honor, I think where we would stop there is when we focus on the confines of the particular social group in question. So the imputed membership would be a distinct question from the actual cognizable social group. And the social group here that Mr. Guzman asserts he's a member of is a very limited group. It's only about complaining witnesses against major Salvadoran gangs. And quite frankly, that's a small group, which I think is clear from, you know, assessing the available case law out there. You wouldn't see many fact patterns that are similar to this case. So I don't know that this would be a very common occurrence. And one other point to raise on that is. An imputed informant who is seen talking to the police within 100 yards of the scene of a murder. I mean, where do we draw the line? Anyone seen talking with a policeman? I think we would draw the line where someone was seen cooperating with the police in public against a major group, major gang. And evidence showed that that person had cooperated with the police. And then that person was persecuted and attacked on that basis. And again, that's a that's another limiting factor here is that it's not just anyone that talks to the police would be granted asylum in this country, but rather someone that was attacked on that basis. And I think the evidence in this cooperation is being perceived as somebody that cooperated. Well, so in the in the I'm funny case, this court makes clear that that when it comes to imputed membership focused on the perception of the persecutor. So it would be anyone who was attacked because they were perceived as having cooperated. And here, I think the evidence is abundantly clear that he was attacked on that basis as he was getting beaten up the first time he was called a traitor. He was called a snitch. So, again, that's another limiting factor that would handle that. Can you talk about Kat? Because I think, frankly, in my opinion, that's a better argument. Well, we think they're both great arguments. But I hope so. To be a good advocate, you've got to believe in it. On the cat point, Your Honor, the the BIAs and the government's position essentially comes down to because one of the thousands of MS-13 gang members died. And because Mr. Guzman was allowed to survive the past torture that he cannot claim future torture. And we just think that that's an that's an untenable position. We don't lead to a conclusion that anybody that survives torture can't. We have yet to be. It would be available to nobody. That's correct. We think based on the position put forth by the government, if it could be dispositive to the ruling that someone survived past torture and they can no longer seek relief under Kat, that that no human being on the planet would be able to see Kat. And so we put forth substantial country conditions, evidence showing that there's thousands of MS-13 gang members still at large. Nothing in the record suggests that any of the conditions have changed in El Salvador. And Mr. Guzman was clearly tortured in the past, something that the BIA did not consider. He was, you know, tracked down 45 minutes away from his house by this same gang. And he was ambushed and kidnapped with his cousin and had a gun put to his head and was demanded that he cooperate with the gang. We posit that that's clear. I agree with your position, particularly on the cognizable social group or on the alternative argument that you make under asylum on political opinion. What should we do with this case if we agree with your position? Can we determine that or should it be sent back to the BIA for them to apply the right test to the claim? So we think on the asylum claim, at a minimum, that the Third Circuit can hold like it did in Garcia, that Mr. Guzman's proffered social group is legally cognizable and then can remand it back to the BIA to determine the other remaining questions, which they did not reach, which could include his membership in that group, be it actual or imputed, which could include whether he was actually persecuted on that basis. And those questions could go back to the BIA. And I want to make one point, which is that on the asylum question, the government's position on the particular social group, the government's position really would be asking the Third Circuit to make new law if it held this requirement of testifying as a requirement to a cognizable group. That would be inconsistent not only with the Third Circuit precedent we talked about, but also precedent from other circuits. There's the Gashi case in the Second Circuit, which the facts of that case clearly show that the petitioner did not testify in court, but rather his status as a cooperator was publicly disclosed via this list. Again, assuredly disclosed public cooperation consistent with Radiwala. And the court there held that the social group was cognizable. And we also have this Morales-Gamez case in the Ninth Circuit, which, again, there was no testimony. Rather, the facts show that the petitioner, quote, openly reported to the law enforcement, which shows, again, that the cooperation was public. And the Ninth Circuit there held that even though the petitioner did not testify because it was open reporting, it put that person in a group much like a witness who testifies. And that would be consistent with what we're asking the Third Circuit. Let's take a cap for a minute on the acquiescence issue. Is the record sufficient to support that? On the acquiescence by a state actor? So we don't actually think the BIA reached that position, but we do think that there's plenty of evidence in the record showing not only can the Salvadoran Ask us to remand it for consideration of that? Or are you asking us to do what with the cap? With the cap claim, we would ask to hold that it was not supported by substantial evidence to go back to the BIA for them to take into account all the evidence, including Mr. Guzman's past torture, which they didn't take into account because they held that there was, you know, this limited group of one person who died and he was allowed to survive. We don't think those are those are tenable reasons not supported by substantial evidence. And we do believe that that there's sufficient evidence in the record showing that the Salvadoran government is willfully blind to MS-13's power. On the cap claim with Tico dead, is there enough evidence to show that the remaining M3 members have a specific attempt to do harm to Guzman? Yes, Your Honor. The evidence shows from from the facts of this case that this was not just one man who was who was attempting to attack Mr. Guzman. Mr. Guzman, after the first attack by five different men, fled 45 minutes away from his house. And I know that within weeks he was within weeks he was tracked down. And this shows that that the MS-13 gang at large, which runs huge neighborhoods in El Salvador, was clearly tracking Mr. Guzman. This is not just one man. This is a gang at large. There's a second individual. That's correct. That's that's correct. The Apollon is still alive. He was involved in the second. That's right. He's the man who put a gun to Mr. Guzman's head, who we would say was the number one perpetrator of the torture. Thank you, sir. Thank you. Guzman was found credible. That's correct. Guzman was credible by the BIA. Thank you. Good morning, Mr. Mack. Good morning and may it please the court. Greg Mack for the attorney general. We ask the court to deny the petition for review. If any petitioner should have received asylum, it should have been Radiola. Radiola was a paid informant whose status was disclosed to police officers and to gang members. And this court held that Radiola did not belong to a particular social group. Petitioner here was simply seen with a police officer. And the argument is, is that his informant status was imputed to him. If Radiola is not eligible for asylum because his particular social group is not cognizable under the INA, neither is this petitioner's particular social group cognizable under the INA. He did not testify. He wasn't an informant. He wasn't a paid informant. All that he argues is that he's a perceived informant to the police. He was seen talking to the police after his neighbors were murdered. But he didn't testify in court. And that makes all the difference under Radiola. So we asked the court to find that the board was correct, that his particular social group was not cognizable because it lacked social distinction. But what about Garcia? Garcia, even in Radiola, there's a footnote in Radiola that says that this court relied on the fact that Garcia testified. So its language is that although... Garcia didn't say the testimony was necessary. But it footnoted four, Your Honor. It says, although Garcia's persecutors suspected her of being an informant long before she testified in open court, we relied on her act of publicly testifying in distinguishing her case from those involving proposed social groups of confidential informants. That's a footnote four. There's a distinction between a confidential informant, the operative term being confidential, and somebody that is seen talking to police on the scene of a crime, and the police immediately thereafter find several dead bodies. That's not a confidential informant. It's not a confidential informant, but they haven't testified in court. And that makes all the difference under the Radiola case, and I think also the Garcia case. But the footnote you just read to us was tethered to the confidential informant. But he's not even, the petitioner's not even a confidential informant here. All he's seen is speaking to a police officer. He could be a bystander to the crime. He could be an eyewitness or, in this case, a hear witness to the case. Someone being seen talking to a police officer simply isn't a cognizable social group. It explodes the concept of particular social group in terms of being limited and being socially distinct. It may be socially distinct to the police officer and people in the neighborhood, but to the Salvadoran society, it's not socially distinct because it lacks that particular characteristic of publicly testifying in court, which is laid out in this court in Radiola and in Radiola's footnote four. We relied on the fact that he publicly testified. So we don't think that there's a particular social group that's cognizable under the INA in this particular case. Now let me turn to the political opinion determination. I think Petitioner makes the point. Hold on a second before you jump to political opinion. Did the BIA do the right analysis in making the determination of whether or not there was a cognizable particular social group? I think it did, John. It says it lacks social distinction. It wasn't socially distinct within Salvadoran society. So it didn't address immutability. It didn't address particularity, but those are just two other parts of the analysis. The other part of the analysis is whether the proposed group is socially distinct, and the board says here we don't believe it's socially distinct. I think what goes on in this case with the board's decision is it first talks about what's the context, and therefore it talks about what have we said in the past, what have the courts said in the past about witnesses, and it talks about the cases where they didn't publicly testify. The next paragraph after that, the board talks about, well, he didn't meet the facts. The IJ was not clearly erroneous in finding that. He wasn't an informant. He wasn't a paid informant, that sort of thing. Then it goes on to rejecting his arguments about social distinction and says this group isn't socially distinct. So that's the steps it goes through. Did the BIA's application of the law to the facts of this case take adequate account of the fact that a particular social group membership can be imputed? Yes, it did. It specifically talked about the immigration judge saying that particular social groups can't be imputed, and the board says whether actual or imputed, if this social group is not cognizable under the INA. So it was taking into account the fact that the IJ had concluded that membership in a particular social group can't be imputed, and the board says whether actual or imputed here doesn't matter because the group isn't cognizable under the social distinction prong. So with respect to the political opinion, I think the argument is that the board, the agency, didn't take into account other motives and that this is a mixed motive case. I think the board basically says there is no other motive here other than being threatened and facing gang intimidation and gang recruitment, and the immigration judge specifically says not every act of defiance climbs to the level of political opinion. The petitioner is not facing a hegemonic force here, and the immigration judge correctly recognizes that this group is essentially four or five individuals, Teco, Palone, and Palone is the one who put the gun to the petitioner's head, but you basically have Teco in both incidents, the first and second incident where Palone put the gun to the petitioner's head. This isn't a hegemonic force of the MS-13 with a nationwide force looking for a petitioner. It's Teco looking for a petitioner in both instances. But there's no dispute that they were all members of MS-13. No, there is actually no claim that they're not members of MS-13, but it's not a – So you don't need all of MS-13 looking for you? Well, I – A couple of them will do the job. Well, I think if you're trying to make the claim that this is a de facto political force and this is a hegemonic force with a network completely looking for a petitioner here, the record here is confined to four or five individuals looking for a petitioner. I think it would be a different case if a petitioner had moved hundreds of miles away within El Salvador and somebody other than Teco and Palone or Teco from the first instance sends a message out to somebody. We have some more sort of record evidence to that. We have no idea who in fact found Guzman with his aunt 45 minutes away. Yes, we do. In the record it says – Well, there was a group that confronted him there, but there's nothing that says that group is the one who traced him there. There could be – you know, the word could have gone out, find this guy, and the word got back and the small group went to confront him. But we have no idea who traced him down or who reported where he was. Well, I think we'd also have to have – the record would have to compel that conclusion, Your Honor, and the record doesn't compel that conclusion. What we have clearly is Teco involved in both incidents, so the record would have to compel the conclusion that that network put Teco and Palone in place. Where all the record shows here is in both instances we have Teco and we have a universe of four or five gang members in that regard, Your Honor. But it wasn't the same neighborhood either. No, it wasn't the same neighborhood. It's 45 minutes away. Correct. It's not the same day. It's 45 and 60, but it's still the same individual, Teco, who saw him in front of the house. So how does this – what's your perspective on the Catt claim in light of these facts? On the Catt claim, it's clear there's no finding by the agency on past torture. There's no finding by the agency on relocation. But I think they looked at the regulation and asked whether it's more likely or not that he's going to be tortured. And because Teco is dead, Palone and Teco let him go in both instances, and Palone was asking questions about joining and collaborating. Okay. They let him go once and they went after him again. Yes. And he left the country. So whether they would have very soon after the second confrontation, right? I believe that's correct, Your Honor. Next day or something like that. Yeah. So who are we to say that they wouldn't have gone after him three times or four times? But, again, the record would have to compel that conclusion. Well, I think it's pretty compelling. Well, we would disagree, Your Honor, that it's compelling in this regard because you have Teco in the first instance, Teco and Palone in the second instance. Palone lets him go after the second instance, and the board says there isn't a likelihood of torture in this case because Teco is dead and Palone let him go after the second instance. No, it doesn't say Palone let him go. It just said he was let go. Well, it said he was let go, but obviously he's here. Is that the way it works? That after the second confrontation, if you let the petitioner go, there's no likelihood of further confrontations, further torture? I think that is about the most speculative proposition I've heard in a long time. Well, that's what the board decided, and the record has to compel a contrary conclusion, Your Honor. Well, I think just looking at the facts and looking at what happens in El Salvador and looking at what happens in many countries when someone is being chased by a gang and has been beaten up twice and after the second beating up flees the country to say that he's not going to be beaten up again, I think is a very speculative proposition. And if the court thinks that the board's decision isn't supported by substantial evidence, to your question, Your Honor, you send it back to the board to look at the other questions on acquiescence and consent to torture because these are private actors. They're not government officials. So how many times did somebody have to survive torture to satisfy your perspective? Well, it's not necessarily my perspective. It's the board's perspective in this particular case that in these particular circumstances, this doesn't rise to the level of clear probability of torture given that Teco is dead  MS-13 is very vibrant. Oh, absolutely. It's cohesive. We're not disputing anything about the dangerousness of the MS-13 gang. Our point here is that this universe was contained down to four or five individuals. But again, if the court disagrees on the cat claim, as to your question, Your Honor, you send it back to the board because, one, we have private actors here and the questions with respect to acquiescence aren't addressed by the board. So you send it back to the board with respect to the cat claim. If there are other areas that the court thinks that are available on the particular social group claim with respect to witnesses, you would send it back for the board to look at whether there's a nexus between the complaining witness. But again, we think there isn't a cognizable particular social group. And then on political opinion, the board did make a nexus determination in that regard, so there's no need to remand on that particular question, Your Honors. If there's no further questions. Thank you, Mr. Mack. Thank you, Your Honors. Thank you. Your Honors, I'd like to make three quick points on rebuttal. First, with respect to the cat claim, Mr. Guzman was first attacked, fled the very next day, 45 minutes away, when he was tracked down the second time, again fled the very next day. So after both instances, fled the next day. We don't know what better evidence there is to show that these men were tracking him down and that he kept trying to avoid torture and he supports that it would likely happen again. Also, on my colleague's point about that these were private actors, in the Sertacci-Duran case, which was also a cat claim, this court remanded back down to the BIA based on torture at the hands of FARC, which is the Revolutionary Armed Forces of Colombia, who were not in control of Colombia at the time. They were nothing more than a criminal organization in Colombia at the time. And we put forth that MS-13 is very similar to FARC and that it's a gang that's not actually in control of El Salvador, but it's running parts of the country. As to my colleague's argument about the floodgates, this would be a two-step analysis. The first would be the cognizability of the particular social group, which again has this very limiting factor of requiring public cooperation. And then separate from that, there's this separate question of whether the petitioner was an imputed member of that group, which requires specific evidence that the persecutors perceived the petitioner to be a member of that group. And that's going to be another important limiting factor. Not every case is going to have that fact. We do have that fact here in that they were calling him a traitor and a snitch as they were attacking him. And one final point on the social distinction question. This court held in the Cuellar-Manzano case that the question of social distinction requires evidence. It's a subjective question. Do the people of the country in question here, El Salvador, recognize the group as socially distinct? The government and the BIA are focused on prior case law, and there's no evidence. There's been no party adverse to Mr. Guzman has put forth any evidence that the people of El Salvador do not recognize complaining witnesses against MS-13 as a distinct group. And Mr. Guzman is the only one that has put forth any evidence on that point. There's country conditions evidence from the United Nations showing that people who complained against major gangs in these countries stand out in their communities. There's evidence from the Canadian Refugee and Immigration Board showing specific in El Salvador that if you complained against MS-13, you're viewed as a traitor in your community. And there's also this evidence of the Witness Protection Program showing that it protects witnesses and those who cooperate in the investigation of a crime, which the Ninth Circuit described as not that it couldn't imagine better evidence of social distinction. And we put forth that same. Witness protection are witnesses who have testified, right? Your Honor, the actual law is witnesses who testify or cooperate in the investigation of a crime. And Mr. Guzman cooperated or is perceived as having cooperated in the investigation of a crime. Thank you, counsel. Thank you. Thank you both for your brief and your argument. We'll get back to you shortly.